## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND
### BALTIMORE DIVISION

**FUNFLICKS, INC., a Texas Corporation**          *
**9600 Great Hills Trail #150w,**          *
**Austin, TX 78759**          *

          *

**Plaintiff,**          *

          *

**v.**          *

          *

**ROGER D. LEWIS individually and t/a**          *          **CIVIL ACTION NO. _____**
**FunFlicks FunFlicks Philadelphia,**          *
**FunFlicks New Jersey and/or Premiere**          *
**Outdoor Movies.**          *
**15 Euston Road**          *
**Marlton, N.J., 08053**          *

          *

**and**          *

          *

**MARIA A.  LEWIS individually and t/a**          *
**FunFlicks, Fun Flicks New Jersey, and/or**          *
**Premiere Outdoor Movies.**          *
**15 Euston Road**          *
**Marlton, N.J., 08053**          *

          *

**and**          *

          *

**LEWIS ENTERPRISES, LLC. and t/a**          *
**FunFlicks, FunFlicks Philadelphia,**          *
**FunFlicks New Jersey and/or Premiere**          *
**Outdoor Movies**          *

          *

**Serve on: Roger Lewis**          *
**Resident Agent and Managing Member**          *
**15 Euston Road**          *
**Marlton, N.J., 08053**          *

          *

**Defendants**          *

---

### PLAINTIFF'S ORIGINAL VERIFED COMPLAINT FOR
### TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION AND
### PERMANENT INJUNCTION, AND FOR DAMAGES AND MONEY JUDGMENT

---

Plaintiff, FunFlicks, Inc., by its attorneys files this Complaint and in support thereof states as follows:

## I.      INTRODUCTION

The FunFlicks brand is well known throughout the United States as a full service indoor & outdoor movie event provider in the area of entertainment, educational and commercial services, namely, the provision of indoor and outdoor parties and events utilizing popcorn machines, projectors, sound systems, and big screens for movies, video gaming and similar projection type services (hereinafter the ("Movie Business").  The Plaintiff is the owner and exclusive licensor of the registered "FunFlicks" Mark. The Lewis Defendants operate their Movie Business though their solely owned, controlled and managed limited liability company, the Defendant, Lewis Enterprises.

The Lewis Defendants were non exclusive licensees of the FunFlicks Mark through their licensing agreements with the Plaintiff and its Maryland predecessor. The Lewis Defendants accumulated debt owed to Plaintiff in excess of $57,000.00 more than $20,000 of which was in payment arrears through the end of May of 2015. The amounts due and owing were exclusive of additional monies owed for royalties on yearly sales in excess of the minimum amount due under the License Agreements. From 2015 to present, the Defendants produced fraudulent sales reports in an effort to avoid paying additional royalties to the Plaintiff. Defendants continued to evade verification of these reports by refusing to provide Plaintiff access suitable for the proper inspection of the Defendants' sales records. Defendants' acts constituted a breach of the Licensing Agreements.

The Plaintiff terminated License Agreements after providing the Defendants a notice and an opportunity to cure the defaults. During the cure period, the Defendants intentionally submitted fraudulent reports concealing their true sales and evading the truthful disclosure of these sales. The Defendants failed to cure these defaults. Consequently, the Plaintiff terminated the license agreements. After termination, the Defendants continue to compete with Plaintiff in knowing violation of the Covenant not to Compete contained the License Agreements and continue to infringe on the Plaintiffs' FunFlicks Mark violating both Maryland and Federal Law. Plaintiff requests temporary, preliminary and permanent injunctive relief and monetary damages against the Defendants.

## II.        PARTIES, JURISDICTION & VENUE

1.        DEFENDANT, ROGER LEWIS ("Mr. Lewis") individually and t/a FunFlicks, FunFlicks Fun Flicks New Jersey is an individual who is a citizen of New Jersey who resides at 15 Euston Road Marlton, N.J., 08053.

2.        DEFENDANT, MARIA A. LEWIS ("Ms. Lewis") individually and t/a FunFlicks an Fun Flicks, New Jersey is an individual who is a citizen of New Jersey who resides at 15 Euston Road Marlton, N.J., 08053.  Ms. Lewis and Mr. Lewis are collectively referred to as the "Lewis Defendants"

3.        DEFENDANT, LEWIS ENTERPRISES, LLC is a New Jersey Limited Liability Company, formed on April 29, 2009. ("Lewis Enterprises") with its managerial principal place of business located at 15 Euston Road Marlton, N.J., 08053.

4.        Lewis Enterprises was formed by Mr. Lewis for the express purpose of operating the Movie Business. Mr. Lewis is the designated Resident Agent, and managing Member of

Lewis Enterprises.

5.      Lewis Enterprises trades as FunFlicks, FunFlicks, New Jersey, FunFlicks Philadelphia and Premier Outdoor Movies. Lewis Enterprise and the Lewis Defendants are collectively referred to as the "Defendants."

6.      PLAINTIFF, FUNFLICKS, INC. ("Plaintiff") is a Texas corporation organized and existing under the laws of the State of Texas , with its principal place of business located at 9600 Great Hills Trail #150W, Austin, TX 78759.

7.      Plaintiff is the holder / assignee and/or owner of the FunFlicks trademarks and license agreements as a result of Plaintiff's asset purchase from FunFlicks, LLC, a Maryland Limited Liability Company ("FunFlicks Maryland").

8.      The sale became effective on or about January 1, 2013, the Plaintiff purchased FunFlicks Maryland assets, which included but were the not limited to the FunFlicks Mark, and the Defendants' License Agreements, promissory notes and related outstanding obligations. A copy of pertinent portion of the Asset Sale Agreement is attached hereto as Exhibit 1.

a.  Trademark License Agreement dated May 2, 2009 executed by and between the original licensor, FunFlicks Maryland, and the Defendants, Mr. Lewis and Ms. Lewis and attached promissory note dated May 2, 2009 executed by Mr. Lewis in favor of FunFlicks Maryland in the original amount of $18,231.00, (collectively the "Southern N.J. License Agreement"). A copy of the Southern N.J.  License Agreement is attached as Exhibit 2 to this Complaint.

b.  Trademark License Agreement dated January 1, 2010 (the "Northern NJ Agreement") executed by and between, the original licensor, FunFlicks Maryland and the licensees. Mr. Lewis and Ms. Lewis, and attached promissory note dated January 1, 2010 executed by Mr. Lewis in favor of FunFlicks Maryland in the original amount of $35,057.00 ("Northern N.J. License Agreement"). A copy of the Northern N.J. License Agreement, Exhibit 3 is attached to this complaint.

c.  Trademark License Agreement dated May 7th 2012 (executed by and between,

the original licensor, FunFlicks Maryland, and the Defendant, Mr. Lewis (the "Philadelphia License Agreement"). A copy of the Philadelphia License Agreement, Exhibit 4 is attached to this Complaint.

9.      The Northern N.J. Agreement, the Southern N.J. Agreement and the Philadelphia Agreement are collectively referred to as the ("License Agreements").

10.      The License Agreements were all executed by Mr. Lewis.

11.      Mr. and Mrs. Lewis were permitted to use their FunFlicks trademark in connection with their Movie Business,   *See* second Whereas Clause at page 1 of the License Agreements.

12.      At the time the License Agreements were executed, Lewis Enterprises was in existence for the sole purpose of operating the Lewis's Movie Business.

13.      Mr. Lewis and /or Ms. Lewis solely controlled and managed and continue to control and manage all of the operations of Lewis Enterprises.

14.      Mr. Lewis caused Lewis Enterprises to pay the Lewis Defendant's obligations and take the benefits under the Licensing Agreements.

15.      Lewis Enterprises paid the amounts due under the License Agreements, used and advertised its business under the FunFlicks Mark, performed all of the services under the FunFlicks Mark and issued checks using the FunFlicks Mark.

16.      The License Agreements at para. 18 contain a choice of law provision which provides that the License Agreements shall be governed by and construed in accordance with the laws of the State of Maryland.

17.      The License Agreements at para. 18 provide that in the event of any disputes between the parties, the State and Federal Courts venued in Baltimore shall have co-exclusive jurisdiction to resolve such disputes.

18.     This action arises under the trademark laws of the United States, specifically 15 U.S.C. §1051, *et seq*.

19.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§1331 and 1338, 15 U.S.C. §1121 and, with respect to certain claims, the Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367.

20.     This Court also has diversity jurisdiction pursuant to 28 U.S.C. §1332 because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

21.     This Court has personal jurisdiction over the Lewis Defendants because the Lewis Defendants consented to the exclusive jurisdiction of a Federal or State Court located in Baltimore when the Lewis Defendants originally contracted with FunFlicks Maryland..

22.     This Court has personal jurisdiction over Lewis Enterprises, Inc. because: (1) Lewis Enterprises is so closely related to and exclusively controlled by the Lewis Defendants and the Lewis Defendant's Movie Business; and (2) the Plaintiff's causes of action, related to the Licensing Agreements and against the Lewis Defendants, are inextricably intertwined with the Plaintiff's causes of action against Lewis Enterprises. Consequently it is foreseeable that Lewis Enterprises would be bound by the Lewis Defendants' consent to Jurisdiction in this Court.

23.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(a)(2)

### III.     ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

A.     <u>**The FunFlicks Mark and System**</u>

24.     The FunFlicks brand is a full service indoor & outdoor movie event provider in the area of entertainment, educational and commercial services, namely, the provision of indoor and outdoor parties and events utilizing popcorn machines, projectors, sound systems, and big

screens for movies, video gaming and similar projection type services (*hereinafter* referred to as the "Movie Business").

25.     Plaintiff has licensees in over 92 licensed locations utilizing its trade mark across the United States. The FunFlicks trademark licensees currently host more than 10,000 indoor & outdoor movie events every year.

26.     Plaintiff has developed a system for providing full service indoor & outdoor movie events.

27.     Plaintiff is the exclusive licensor of well-known and famous trademarks, service marks, designs, logos, colors, color patterns and business methods for use in the Movie Business, and for promotion of Plaintiff's services, products, programs and marketing, which are on the principal register of the United States Patent and Trademark Office and known as FunFlicks (the "FunFlicks Mark").

| Registration No. | Service Mark | Registration Date |
|------------------|--------------|-------------------|
| 3,138,905, | FunFlicks® | September 5, 2006 |

A copy of the registration is attached to this Complaint as Exhibit 5.

28.     Plaintiff has the exclusive right to sublicense the use of the FunFlicks Mark.

29.     Plaintiff and its predecessors have continuously used the FunFlicks Mark since the date of the registration and the FunFlicks Mark is in full force and effect pursuant to 15 U.S.C. §1065.

30.     Plaintiff has given notice to the public of the registration of the FunFlicks Mark as provided in 15 U.S.C. §1111.

31.     Through the FunFlicks Mark, Plaintiff markets, promotes, and provides services to its customers throughout the United States.

32.      In order to identify the origin of their and to promote the FunFlicks® brand name, Plaintiff allows its licensees to operate under the FunFlicks marks and system.

33.     Plaintiff and its predecessors invested substantial effort over a long period of time, including expenditures in excess of two million dollars, to purchase and develop goodwill in the FunFlicks Marks to cause consumers throughout the world to recognize the FunFlicks Marks as distinctly designating FunFlicks outdoor movie event services as originating with Plaintiff using the FunFlicks Mark.

34.     The value of the goodwill developed in the FunFlicks Mark does not lend itself to a precise monetary calculation, but because the FunFlicks Marks are widely known for providing movie event services, the value of FunFlicks Marks is substantial.

**B.      The License Agreements**

35.     On or about May 2, 2009 and January 1, 2010, FunFlicks Maryland and the Lewis Defendants entered into and executed the Southern N.J. License Agreement and Northern N.J. License Agreement whereby FunFlicks, Maryland granted the Lewis Defendants the right to use the FunFlicks Marks in connection with their Movie Business, Lewis Enterprises, limited to the territories identified in Exhibits 2 and 3 respectively.

36.     On or about May 7, 2012, FunFlicks Maryland and Mr. Lewis entered into and executed the Philadelphia License Agreement. Whereby FunFlicks, Maryland granted Mr. Lewis, the right to use the FunFlicks Marks and System in the territory identified in Exhibit 4.

37.     The License Agreements provide in part.

Grant of License. Subject to the terms and conditions set forth herein, for the term

of this Agreement, Licensor hereby grants to Defendants a non-transferable right within the territory set forth on Exhibit A attached hereto and made a part hereof (the "Territory") to use the Mark specifically in connection with the Business.

38.     The term Business is defined on page 1 of the License Agreements as follows:

the Licensees' business of entertainment, educational and commercial services, sponsorships, namely, the provision of indoor and outdoor parties and events utilizing popcorn machines, projectors, sound systems, equipment, and big screens for movies, video gaming and similar projection type services, (the "Movie Business.")

39.     In exchange for the use of the FunFlicks Mark in the specified Territory for the

Southern N.J.  License Agreement, the Defendants agreed to, *inter alia,* at paragraph 3.

a.  Licensee shall pay to Licensor on a monthly basis royalties equal to six percent (6%) of the gross sales made by Licensees in connection with its Business during the previous month (the "Monthly Royalty .Payment"). The Monthly Royalty Payment shall be paid by Licensee to Licensor at the address of Licensor specified above by the fifteenth (l5th) day of the month. ***Each Monthly Royalty Payment will be accompanied by a statement from Licensee that sets forth the gross sales of Licensee for the previous month***.

b.  Notwithstanding the terms and conditions of subsection (a), the Licensee shall be required to pay to Licensor ***a minimum annual royalty payment of: Two Thousand Four Hundred Fifty Dollars ($2,450.00)*** (the "Minimum Annual Royalty Payment") for the Territory described in Exhibit A. To the extent that the Monthly Royalty Payments actually paid by Defendants to Licensor in a twelve month period measured from the month and day first above written to the anniversary date of the Effective Date (the "Anniversary Date") are less than the Minimum Annual Royalty Payment, then Licensee shall be required to remit to Licensor the difference between the Minimum Annual Royalty Payment and the Monthly Royalty Payments actually paid by Licensee, within thirty (30) days of the Anniversary Date.

c.  Notwithstanding subsection (b) of this Section, upon execution and delivery of this Agreement, Licensee shall pay the Licensor an amount equal to the Minimum Annual Royalty Payment upon execution and delivery of this Agreement. The first year's Minimum Annual Royalty Payment shall be deemed earned by Licensor upon the execution and delivery of this Agreement and is therefore non-refundable to Licensee. To the extent, however, that Licensee opts for the educational program set forth in Section 7(c) of this Agreement, Licensor, at its sole discretion, may opt to waive the requirement of Licensee to pay the first year's Minimum Annual Royalty Payment up front,

upon execution and delivery of this Agreement. The Minimum Annual Royalty will still be due on a monthly payment schedule, just not up-front.

d.   In connection with the Monthly Royalty Payment, Licensee shall keep and maintain records of sales made pursuant to the license granted hereunder for a period of seven (7) years following the expiration of this Agreement. *Such records will be open to inspection by Licensor or its designee at Licensee's place of business upon prior notice by Licensor.* In the event that an inspection of the Licensee's records reveals that Licensee has underpaid the Monthly Royalty Payment to Licensor, Licensee shall remit such underpayment to Licensor within ten (10) days notice by Licensor to Licensee and if such underpayment exceeds five percent (5%) of the amount paid by Licensee to Licensor, Licensee shall be responsible to pay for Licensor's costs of inspection of Licensee's records.

40.      In consideration for the use of the FunFlicks Mark in the specified territory for the

Northern N.J.  License Agreement, the Defendant's agreed to *inter alia*,

a.   Licensee shall pay to Licensor on a monthly basis royalties *equal to six percent (6%) of the gross sales* made by Licensee in connection with its Business during the previous month (the "Monthly Royalty Payment"). The Monthly Royalty Payment shall be paid by Licensee to Licensor at the address of Licensor specified above by the fifteenth (15th) day of the month. *Each Monthly Royalty Payment will be accompanied by a statement from Licensee that sets forth the gross sales of Licensee for the previous month.*

b.   Notwithstanding the terms and conditions of subsection (a), the Licensee shall be required to pay to Licensor a minimum annual royalty payment of: *Four Thousand Nine Hundred Dollars ($4,900.00)* (the "Minimum Annual Royalty Payment") for the Territory described in Exhibit A. To the extent that the Monthly Royalty Payments actually paid by Licensee to Licensor in a twelve month period measured from the month and day first above written to the anniversary date of the Effective Date (the "Anniversary Date") are less than the Minimum Annual Royalty Payment, then Licensee shall be required to remit to Licensor the difference between the Minimum Annual Royalty Payment and the Monthly Royalty Payments actually paid by Licensee, within thirty (30) days of the Anniversary Date.

c.   Notwithstanding subsection (b) of this Section, upon execution and delivery of this Agreement, Licensee shall pay the Licensor an amount equal to the Minimum Annual Royalty Payment upon execution and delivery of this Agreement. The first year's Minimum Annual Royalty Payment shall be deemed earned by Licensor upon the execution and delivery of this Agreement and is therefore non-refundable to Licensee. To the extent, however, that Licensee opts for the educational program set forth in Section 7(c) of this

Agreement, Licensor, at its sole discretion, may opt to waive the requirement of Licensee to pay the first year's Minimum Annual Royalty Payment up front, upon execution and delivery of this Agreement. The Minimum Annual Royalty will still be due on a monthly payment schedule, just not up-front.

d. In connection with the Monthly Royalty Payment, Licensee shall keep and maintain records *of sales made pursuant to the license granted hereunder for a period of seven (7) years following the expiration of this Agreement. Such records will be open to inspection by Licensor or its designee at Licensee's place of business upon prior notice by Licensor.* In the event that an inspection of the Licensee's records reveals that Licensee has underpaid the Monthly Royalty Payment to Licensor, Licensee shall remit such underpayment to Licensor within ten (10) days notice by Licensor to Licensee and if such underpayment exceeds five percent (5%) of the amount paid by Licensee to Licensor, Licensee shall be responsible to pay for Licensor's costs of inspection of Licensee's records.

41.    In consideration for the use of the FunFlicks Mark in the specified territory for the

Philadelphia Agreement, the Defendant's agreed to *inter alia.*

a. . . . Licensee shall pay to Licensor: A ("Minimum Annual Royalty Payment") described as: During the initial term and each subsequent Renewal Term, the greater amount of a Royalty equal to six percent (6%) of the gross sales made by Licensee in connection with *its Business during each Renewal Term or* Two Thousand Four Hundred Fifty Dollars ($2,450.00). During the Initial Term and Renewal Terms, a Minimum Monthly Royalty Payment shall be paid by Licensee to Licensor at the address of Licensor specified above by the fifteenth day of the month. *Each Monthly Royalty Payment will be accompanied by a statement from Licensee that sets forth the gross sales of Licensee for the previous month.*

b. Notwithstanding the terms and conditions of subsection (a), the Licensee shall be required to pay to Licensor a ("Minimum Monthly Royalty Payment") described as: (i) Two Hundred Four Dollars and Seventeen Cents ($204.17) due each month of the first 36 months of the Initial Term (commencing with the first payment due May 15, 2012; and (ii) Two Hundred Four Dollars and Seventeen Cents ($204.17) due each month of each consecutive Renewal Terms (commencing with the first payment due January 15, 2016 for the Territory described in Exhibit A. To the extent that the Minimum Monthly Royalty Payments actually paid *by Licensee to Licensor in a twelve month period measured from the month and day first above written to the anniversary date of the Effective Date (the "Anniversary Date") are less than the Minimum Annual Royalty*

***Payment,*** then Licensee shall be required to remit to Licensor the difference between the Minimum Annual Royalty Payment and the Monthly Royalty Payments actually paid by Licensee, within thirty (30) days of the Anniversary Date.

c.  Notwithstanding subsection (b) of this Section, upon execution and delivery of this Agreement, Licensee shall pay the Licensor an amount equal to the Minimum Annual Royalty Payment upon execution and delivery of this Agreement. The first year's Minimum Annual Royalty Payment shall be deemed earned by Licensor upon the execution and delivery of this Agreement and is therefore non-refundable to Licensee. To the extent, however, that Licensee opts for the educational program set forth in Section 7(c) of this Agreement, Licensor, at its sole discretion, may opt to waive the requirement of Licensee to pay the first year's Minimum Annual Royalty Payment up front, upon execution and delivery of this Agreement. The Minimum Annual Royalty will still be due on a monthly payment schedule, just not up-front.

d.  In connection with the Monthly Royalty Payment, Licensee ***shall keep and maintain records of sales made pursuant to the license granted hereunder for a period of seven (7) years following the expiration of this Agreement. Such records will be open to inspection by Licensor or its designee at Licensee's place of business upon prior notice by Licensor.*** In the event that an inspection of the Licensee's records reveals that Licensee has underpaid the Monthly Royalty Payment to Licensor, Licensee shall remit such underpayment to Licensor within ten (10) days notice by Licensor to Licensee and if such underpayment exceeds five percent (5%) of the amount paid by Licensee to Licensor, Licensee shall be responsible to pay for Licensor's costs of inspection of Licensee's records.

## C.   Lewis Defendants Default under the License Agreements

42.   Pursuant to the terms of the License Agreements, the Lewis Defendants were required to send the Plaintiff sales reports of their gross sales.

43.   Plaintiff repeatedly requested Defendants' gross sales reports required under the License Agreements.

44.    In 2015, Defendants produced a purported Schedule C from the Lewis Defendants' 2013 Federal Tax Return. A copy of the 2013 Scheduled C is attached hereto as Exhibit 6.

45.    Plaintiff continued to request sales reports for 2014 and 2015 from the Defendants which the Defendants ignored through March 2016.

46.    On April 11, 2016, the Plaintiff sent the Defendants a notice of his intent to inspect the Defendants' sales records, which provided in part:

> We probably should chat about your revenue numbers.
>
> Based on the following information I believe you are under reporting your revenue:
>
> 1. The 3 NJ territories and Philly territory receive more lead requests from the FF web site than 90% of the other territories in the country, which should translate into more business/revenue than most
>
> 2. The majority of other territories reporting year-over-year increases in the same geographical area (weather, population, etc.) and with similar time in business, have reported revenue growth much higher than you have reported in terms of percentage
>
> 3. Our inability to get valid revenue reports from your accounting system showing sales for 2014 & 2015 makes me believe you aren't sharing them for a reason
>
> 4. We are requesting to inspect your sales records for the last 3 years to validate the numbers (2013 – 2015). We will travel to your office per the agreement to review the sales records with you at your earliest convenience, but would like to make our travel arrangements within the next 7 days for our visit to occur within the next 14-21 days.
>
> I included a copy of the language outlining our right under the agreement to inspect sales records.  (d) In connection with the Monthly Royalty Payment, Defendants shall keep and maintain records of sales made pursuant to the license granted hereunder for a period of seven (7) years following the expiration of this Agreement. Such records will be open to inspection by Licensor or its designee at Licensee's place of business upon prior notice by Licensor. In the event that an inspection of the Licensee's records reveals that Defendants has underpaid the Monthly

Royalty Payment to Licensor, Defendants shall remit such underpayment to Licensor within ten (10) days notice by Licensor to Defendants and if such underpayment exceeds five percent (5%) of the amount paid by Defendants to Licensor, Defendants shall be responsible to pay for Licensor's costs of inspection of Licensee's records.

A copy of this notice is attached hereto as Exhibit 7.

47.    The Defendants responded without objection to the sales records inspection notice by sending the Plaintiff, the Defendants' Schedule C appearing to be an alleged schedule attached to the Defendants 2014 tax Returns. The Defendants, through Mr. Lewis, also responded to the notice to inspect the records, via text to Plaintiff on or about April 15, 2016. The Defendants' text provided in part. A copy of the 2014 schedule C is attached hereto as Exhibit 8.

I just sent you 2014 and will send 2015 as soon as my fingers have it. As for under reporting my sales I am giving you tax forms as directed by my attorney. After you have the 2015 return we will be in compliance as per the "Sales" requirement."

48.    Plaintiff responded by text in part –

We've been asking for sales records for years and finally got 2013 last year.  We now have 2014, 2 years after initially asking for them. Given that sales records are due Jan 15th each year, that's far from being in compliance.  It's simply a gross sales report from your accounting software (either IO or QuickBooks or whatever you use) so it's doesn't require your taxes being done to report that number.  Gross sales are gross sales, minus any refunds, it's a 5 min process to pull that number.

I don't know what you or your attorney's interpretation is of Sales Records, but a Schedule C certainly is not it.

We have the right to request an audit of your sales records, which is what we've asked for so I just need to know if you're going to allow an inspection of them or not?

If everything is on the up and up, there shouldn't be a problem with us or our designated agent reviewing those records with you.  Prior

> to that, screen shots from IO showing year over year total sales numbers in the Sales tab along with the sales by rental item would suffice or a similar sales report from QuickBooks would also suffice.

49.     The Defendants failed to provide the Plaintiff a date to inspect the books and records. The Defendants failed to provide the Plaintiff with the 2015 Sales Report at this time.

**D.     Defendants Fail to Cure Defaults Under the Licensing Agreement**.

50.     On May 5, 2016, Plaintiff by and through its legal counsel, sent the Defendants notices of default letters as to the Southern N.J. License Agreement and Philadelphia License Agreement requiring the Defendants, *inter alia*, -

    a.   to cure the default of their failure to provide gross sales reports required under Section (3)(b) of the Southern N.J.  and Philadelphia License Agreements.

    b.   to cure the default of their failure to permit inspection of the Defendants' sales records.

A copy of the Default Letters is attached hereto as <span style="color:red">Exhibit 9 and 10 respectively.</span>

51.     On May 16, 2016, Plaintiff, sent a similar default letter to the Defendants regarding the above referenced a and b defaults which also occurred in the Northern N.J. License Agreement. Copies of the Default Letters are attached hereto as <span style="color:red">Exhibit 11.</span>

52.     On May 18, 2016, Plaintiff sent Defendants' Counsel an evidence preservation letter. This Letter provides in part –

> As you are also aware pursuant to our phone conversation and my follow-up letter to you dated May 18, 2016, Licensor is concerned that Licensee may be underreporting sales. The purpose of this communication is to place Licensee on notice of his and/her legal obligation to preserve certain evidence. Specifically, Licensor hereby requests that Licensee preserve, and not alter in any way, any evidence, electronically stored documents. . .
>
> Electronic data includes, but is not limited to, originals and all copies of electronic mail (e-mail); activity listings of electronic

mail receipts and/or transmittals; voicemail; audio or video recordings of any kind; computer programs (whether private, commercial or a work-in-progress and including, without limitation, Inflatable Office and Licensee's accounting software); programming notes or instructions; output resulting from the use of any software program, including word processing documents, spreadsheets, database files, charts, graphs and outlines (in their native formats, with all metadata intact, as well as all non-identical versions stored by you in a backup format); Licensee's accounting software); programming notes or instructions; output resulting from the use of any software program, including word processing documents, spreadsheets, database files, charts, graphs and outlines (in their native formats, with all metadata intact, as well as all non-identical versions stored by you in a backup format);

A copy of the May 18, 2016 Letter is attached hereto as Exhibit 12.

53.    On May 18, 2016, Plaintiff's Counsel sent Defendants' legal counsel a letter which provided in part- the following:

a.    …Licensor has advised that the Licensee has recently asked what is required for records inspection related to each of the Agreements and the NJ Agreement."

b.    "Please inform Licensee that records inspection may occur remotely in lieu of onsite inspection if Licensee provides Licensor with remote access to Licensee's Inflatable Office software program, inclusive of income (e.g., sales) entries related to Licensee's business, as well as access to the accounting software (i.e., QuickBooks) used in connection with Licensee's business."

c.    "The provision of access must include the website address at which the records can be accessed, together with logon information (e.g., user name and password) permitting use of the software programs and access to income entries related to Licensee' business."

d.    "If the inspection is not conducted remotely, it will be conducted at Licensee's principal place of business, which Licensor understands to be 15 Euston Road, Marlton, N.J. , and the same access will be required, but Licensee will also need to produce original records related to Licensee's operations and income."

e.    "…based on the age of Licensee's business and the scope and demographics of Licensee's territory, based on the income of Licensee which have similar operations, Licensor believes that Defendant's sales should be higher than reported and, therefore, Licensor is concerned that Licensee may be underreporting." (emphasis added).

A copy of the May 18, 2016 Letter is attached hereto as Exhibit 13.

**E.     Defendants Engage in Evasive Tactics to Prevent Proper Access to Sales Records and Sales Reports**

54.     On May 20, 2016, Defendants failed to permit Plaintiff access to its sales records electronically. Rather, Defendants sent Plaintiff several pages of pdf documents containing a summary of sales reports for 2014, 2015, and portions of 2016 (the May 20th Sales Report".) which could not be verified because the Defendants continued to refuse Plaintiff electronic access to the sales data contained in the Defendants' Inflatable Office Program and Defendants' Accounting Program. Redacted 2014 and 2015 copies of the May 20th Sales Report  are attached to this Complaint as Exhibits 14[1] and 14A respectfully.

55.     On May 25, 2016, Plaintiff's Counsel advised Defendants' counsel that the May 20, 2016, proffer of documentation was woefully inadequate and did not constitute an inspection of the records pursuant to the License Agreements;

   a.  the deadline to cure the defaults under the License Agreements was 12:01 a.m. on June 2, 2016 (which deadline operated to provide Defendants additional time to cure the defaults noticed in the May 5, 2016 default letters with respect to the PA Agreement and Southern NJ Agreement);

   b.  if Licensor's inspection rights were not provided in accordance with the License Agreements prior to 12:01 a.m. on June 2, 2016, each of the License Agreements (as applicable) would be terminated as of such date and time;

   c.  The Licensee continues to remain evasive with respect to their income and related books and records; and

   d.  Coupled with the discrepancies of sales in similar markets and the lack of detail in the proffered sales reports (which do not indicate whether the same are for all 3 territories or only one territory, nor the accounting system from which the same were generated), a full records examination and inspection is reasonable and is required.

---

1 Exhibit 14 was converted to an excel sheet to make removal of names easier.

A copy of the May 25, 2016 Letter is attached hereto as Exhibit 15.

56.    On May 26, 2016, Mr. Lewis provided Plaintiff with limited access to the Inflatable Office software and data, which access resulted in the availability of cursory summary reports. This access consisted of less information than the Defendants provided in the May 20th PDF Documents. Consequently, the Plaintiff was unable to review the data to verify the numbers provided. A copy of what Plaintiff was able to retrieve is attached hereto as Exhibit 16.

57.    On May 27, 2016, Counsel for the Plaintiff advised Defendants' counsel, *inter alia,* that:

a.    Defendants remained in default of the License Agreements for failing to "open to inspection" the books and records of Defendants;

b.    Defendants continued to lock out and prevent Plaintiff access to Defendants' sales records;

c.    although Defendants provided a username and password for the Inflatable Office account, the access provided was limited and prevented Plaintiff from accessing records and, with respect to the access provided, Plaintiff was only permitted to access cursory summary reports, which contained less information than Defendants provided in reports you previously delivered via .pdf;

d.    the License Agreements clearly require Defendants to "open for inspection" Defendants' sales records;

e.    www.businessdictionaIycom/definition/record.htmi defines a record" as:

• the document that memorializes and provides objective evidence of activities performed, events occurred, results achieved, or statements made. Records are created/received by an organization in routine transaction of its business or in pursuance of its legal obligations. A record may consist of two or more documents.

• all documented information, regardless of its characteristics, media, physical form, and the manner it is recorded or stored. Records include accounts, agreements, books, drawings, letters, magnetic/optical disks, memos, micrographics, etc. Generally

speaking, records function as evidence of activities, whereas documents function as evidence of intentions;

f.   the plain meaning of the term "open to inspection" means the opening of all of the doors to the sales records, not the act of restricting or precluding review;

g.   as previously indicated, access is required to inspect the "records", including any backup records;

h.   with respect to backup records, Defendants were able to provide Plaintiff remote access to the Inflatable Office records by contacting Inflatable Office and instructing it to download the information to Plaintiff. Alternatively, Defendants could provide Plaintiff with written authorization to access the information, which authorization should state that Inflatable Office is authorized to either provide copies of all records of Defendants directly to Plaintiff or establish remote access on behalf of Plaintiff; and

58.    Defendants failed to provide Plaintiff open remote access or provide reasonable advance, written notice of a date on which on-site inspection could occur prior to June 2, 2016.

59.    The Defendants ignored Plaintiff's repeated requests and detailed instructions for remote access to Licensee's records. Rather, Licensee's response was to provide, via Defendant's Counsel May 31, 2016, email, a data dump of a large .pdf file containing what purports to be two-thousand four hundred and sixty (2,460) pages of sales records for 2014 and 2015 (the "Misrepresented 2014-2015 Sales Records").

60.    On June 1, 2016, Defendants revoked Plaintiff's limited access to the Inflatable Office program.

61.    Plaintiff conducted a cursory inspection of the data coupled with telephone and internet follow up and search and discovered that the Defendant's were misrepresenting their sales, by omitting records of sales.

**The Defendants Intentionally Concealed a Large Dollar Volume of Seals to Avoid Paying Additional Royalties.**

62.     The Misrepresented 2014-2015 Sales Records omitted records of several large sales and customers for 2014 and 2015. The following are just a few examples of the misrepresentations in the 2014-2015 Sales Records:

**Mr. Lewis Brags about $35,000.00 in sales for 2015 from the "Jumbo Screen" but only lists one actual charged rental in the Amount of $2,052.26**

63.     There is only one event contract in the Misrepresented 2014-2015 Sales Records that indicates an actual charged rental of Licensee's 40' x 22' screen (the "Jumbo Screen") in the amount of $2,052.26 *See Contract dated 6/13/2015 with THA– Exhibit 17,* In prior 2016 communications between Mr. Lewis and Mr. Landers, Plaintiff's President and CEO Mr. Lewis advised Mr. Landers that the Jumbo Screen was the big revenue maker last year (e.g., 2015) and the primary generator of $35,000 in additional revenue in 2015 over 2014.

**Mr. Lewis Conceals Sales for 10 movies for the Borough Stone Harbor.**

64.     **Borough of Stone Harbor** – This entity does not show up in the Misrepresented 2014-2015 Sales Records. Plaintiff conducted a Google search of "outdoor movies" in New Jersey and discovered a series of ten (10) outdoor movie events held in the Borough of Stone Harbor. *See* 2015 Special Events for Stone Harbor attached hereto as Exhibit 18. Also available on the Internet were the Borough of Stone Harbor City Council meeting minutes which included a log of all checks issued.

65.     Checks #40117 is made payable to FunFlicks in the amount of $3,405. A copy of the Stone Harbor's Minutes obtained from the internet is attached hereto as Exhibit 19. See Page 9 of Exhibit 19..

66.     Based on the fact that the Borough of Stone Harbor held ten (10) events in 2015, Plaintiff has reason to believe that more than $3,405 was paid to Licensee in 2015 by either the Borough of Stone Harbor or Stone Harbor Recreation who hosted the ten events.

### Defendants Hide Camden Event charging $15.00 per Automobile for Entry to Big Screen Event.

67.     **Cooper's Ferry** – The 2015 Sales Report fails to disclose a contract with Coopers Ferry Partnership. Plaintiff conducted an online search and found pictures posted on the Defendants' Website which lead to the discovery of an article showing a joint venture between Coopers Ferry and the City of Camden to show drive in movies using the Defendants' Jumbo Screen. A copy of the article obtained is attached hereto as Exhibit 20.

### Mr. Lewis Conceals 5 More Outdoor Movie Event Productions in in 2015 with Customer City of Passaic.

68.     City of Passaic – For 2015, Defendants included a copy of one contract for them dated 8/18/15 in the amount of $844.23. See Exhibit 21 attached to this Complaint. The Defendants' 2015 Sales Report only shows one contract in 2015 for one event with the City of Passaic.  On or about June 1, 2016, Mr. Landers contacted the city of Passaic, N.J. and asked them how many events they had with FunFlicks in 2015. She replied that in 2015 the City of Passaic held 6 events. Mr. Landers conducted an internet search showing that the City of Passaic held six events in 2015.  *See* Face Book Search of Events attached hereto as Exhibit 21A.

### Defendants Conceal Gross Revenues by an Estimated $315,000.00 Over a Three Year Period.

69.     The Plaintiff compared the market revenue from a comparable FunFlicks sales territory in Massachusetts. Using this comparison, the Plaintiff believes that the Defendants have

intentionally under reported gross sales by $315,000.00 for the years 2013, 2014, and 2015, resulting in a shortage of commissions in the approximate amount of $21,600.00.

|  | 2013 | 2014 | 2015 |  |
|---|---|---|---|---|
| Reported | $138,000.00 | $159,000.00 | $237,221.36 |  |
| Minimum Gross Sales [2] | $163,333.33 | $163,333.33 | $163,333.33 |  |
| Comparable Sales Territory Mass. | $200,000.00 | $300,000.00 | $350,000.00 |  |
| Difference for calculation of additional Royalty [3] | $36,666.67 | $136,666.67 | $186,666.67 |  |
| Royalty % | 0.06 | 0.06 | 0.06 |  |
| Add. Royalty Due at Time of Termination | $2,200.00 | $8,200.00 | $11,200.00 | $21,600.00 |
| Misrepresented Gross Sales [4] | $62,000.00 | $141,000.00 | $112,778.64 | $315,778.64 |

**Defendants Evasive Tactics Denied Plaintiff Proper Access to Sales Records After Notice, Notice of Default and Failure to Cure**.

70.    The Defendant's acts are intentional as illustrated by – (1) their refusal to grant the Plaintiff full access to their Sales Records, (2) the false reporting of their sales reports; and (3) The Defendants continued concealment and evasive conduct despite repeated warnings and letters advising the Defendants truthfully disclose the sales and allow access. The Defendants' motive was to intentionally avoid paying additional royalties to Plaintiff.

---

2    The minimum gross sales is calculated by taking the minimum royalty payment due for all three licenses ($9,800) and dividing that number of the commission percentage 6%.  [9,800 / 6% = 163,333.33].

3    The Difference for Calculation of Additional Royalty is the difference between the Comparable Sales Territory Gross Sales and the Minimum Gross Sales.

4    The Misrepresented Gross sales is the difference between the Comparable Sales Territory Gross Sales and the Minimum Gross Sales.

71.     If the Defendants were truthful about their sales reports, it would have taken less than 30 minutes to give the Plaintiff full access to records by providing them with a pass code and username or granting permission to the Inflatable Office Personal to turn over all existing backup and current copies of their sales records.

**F.      Defendants Fail to Cure Default – License Agreements are Terminated.**

72.     Plaintiff terminated the License Agreements effective 12:01 am on June 2, 2016 for reasons solely due to the fault of the Defendants set forth as follows: (1) the Lewis Defendants' default of the  License Agreements by failing to provide Plaintiff with the non-fraudulent gross sales reports (2) the Defendants' failure to provide Plaintiff access to inspect the Defendants' sales records after providing notice; and (3) the Defendants' failure to cure these defaults after Plaintiff provided notice of these defaults and an opportunity to cure. At the time of the Termination, the Lewis Defendants owed Plaintiff (1) $58,040.90 in base royalties and prior monetary obligations; (2) an estimated $21,000.00 in additional royalties; and (3) Plaintiff's incurred and incurring attorney's fees, costs and expenses related to the matters set forth in the complaint.

**G.      The Defendants Are Violating the Covenant not to Compete.**

73.     The License Agreements at paragraph 11 contain a covenant not to compete which provides:

        a.   Non-Competition. For a period of three (3) years following the termination of this Agreement, Licensee agrees that it shall not compete with the Business of the Licensor of entertainment, educational and commercial services, namely, the provision of indoor and outdoor parties and events utilizing popcorn machines, projectors, sound systems, and big screens for movies, video gaming

and similar projection type services within the United States. Specifically, this provision shall not be applicable if the agreement is terminated by the Licensor through no fault of the Licensee. If Licensee chooses not to renew this agreement, this provision and all parts will continue in full force. In all cases, sections 5(b), 6, 9, 10, 12 and 13 shall survive the termination or non-renewal of this agreement.

This paragraph 11 contained in all of the License Agreements is hereinafter referred to as the "Covenant not to Compete"

74.    On June 3, 2016, Plaintiff's counsel advised Defendants through their counsel of the termination of the License Agreements, advising them, *inter alia,* of -

a. ***that, pursuant to Section 9 of the License Agreements, Defendants were to "immediately discontinue all uses of the Mark*** and any term confusingly similar thereto, ***to destroy all materials bearing the Mark***, and that all rights in the Mark and the goodwill connected therewith shall remain the property of Licensor. In addition, Licensee ***shall return all materials provided by Licensor pursuant to Section 7(a)***[5]…modify its corporate name via the filing of a Certificate of Amendment if the corporate name contains the Mark or a mark confusingly similar to the Mark and shall file a termination of the use of the Mark as an alternate name with the applicable filing office. Moreover, following termination Licensee shall continue to be bound by Sections 5(b), 6, 9, 10, 11, 12, 13 and 14" of the Agreement;

b. advised Defendants of its obligations with respect to Confidential Information, as set forth in Section 10 of the Agreement.

c. Advised the Defendants of its obligations pursuant to Section 11 of the Agreement, including, without limitation, the Defendants are prohibited for a period of three (3) years from June 2, 2016, from competing with the movie business.

75.    Despite, these warnings, the Lewis Defendants, jointly an severally and/or by and their operation of their solely owned, controlled and managed Movie Business Lewis Enterprises are willfully violating the Covenant Not To Compete and

---

[5]Paragraph 7(a) of the License Agreements provides - licensor shall make available pre-designed advertisements marketing techniques, advertisements, samples, and ideas, each of which utilize the Mark.

76.     The Defendants have failed to return and destroy confidential information and are continuing to infringe on the FunFlicks Mark.

77.     The Defendants operate a web page at www.premiereoutdoormovie.com

78.     The Defendants advertise as an outdoor movie provider utilizing big screens.

79.     The Defendants have expanded their territory beyond their original territory to compete with Plaintiff's Movie Business, in the Harrisburg and York, PA areas and has provided services in the areas of the State of New York. The Defendants have phone listings for:

South Jersey 856.552.0467   Central Jersey 973.309.7227

North Jersey 201.735.7693   Philadelphia 215.600.1794

Harrisburg and York 717.993.4164.

80.     The Defendants continue to use phone numbers associated with the FunFlicks Mark.

81.     As of June 15, 2015, the phone number currently used by the Defendants 201.735.7693 has been associated with FunFlicks for several years. Currently, it is advertised on superpages.com



82.     The above phone number utilized the FunFlicks mark for several years.

83.     The Phone Number currently used by the Defendants 856-552-0467 to compete with the Plaintiff's FunFlicks business is found on -

http://familyfuninsouthjersey.blogspot.com/2014/01/not-your-average-birthday-party.html



84.     The above number was used in connection with the FunFlicks Mark for several

years.

85.     As of June 16, 2016, The Phone Number currently used by the Defendants 973-

309-7227 to compete with the Plaintiff's FunFlicks business is found on –

http://outdoor-bar-fridge-nz.outdoor-furniture.top/outdoor-movie-party-rental-nj.html

> (973) 309-7227 FunFlicks® of New Jersey provides movie
> event rental service throughout the state of New Jersey and
> surrounding areas. Keep in mind, we have audio visual
> equipment rentals available in NY, PA, DE and
> surrounding states!

86.     The Defendants are using these phone numbers to compete with the Plaintiffs in

the Movie Business.

87.     The purpose of the Covenant not to Compete in the License Agreements is to

protect the Plaintiff's business and prevent infringement of its trademark after Termination.

88.     The Covenant not to Compete prevents the terminated licensee from profiting

from the clientele generated by the FunFlicks Mark.

89.     The Covenant not to Compete prevents the terminated licensee from operating in

a manner which confuses a customer into believing that he is dealing with the FunFlicks brand.

90.     The Covenant not to Compete maintains territories profitable for its licensees.

91.     The Covenant not to Compete prevents the terminated licensee from using

contract templates containing its brand name.

---

**H.**

**Defendants are infringing on the FunFlicks Mark by Using the FunFlicks Mark in Contracts and Receipts.**

**Defendants Falsely Represent to Customers that a FunFlicks Host will Provide the Movie Business Services**

**Defendants are using the FunFlicks Mark and Materials to Compete with the Plaintiff in violation of the License Agreements and Federal Law.**

92.      Despite the termination of the License Agreements on June 2, 2016, the Defendants use contracts containing the FunFlicks Mark impersonating FunFlicks as the host providing the Movie Business Services.

93.      On or about the June 13, 2016, Defendants caused to be prepared a Movie Business contract which was derived from Plaintiff's sample contract containing the FunFlicks Mark. A copy of this June 13, 2016 contract is attached hereto as Exhibit 22 and is hereinafter referred to as "Customer Contract 1".  The Customer accepted the Defendants' prepared contract and emailed it to the FunFlicks email server rather than to the Defendants' e-mail address.

94.       The Defendants contract represents that FunFlicks is the provider of the Movie Business service.

95.      The contract contains the FunFlicks Mark as follows:



**INFORMATION & TERMS**

Your movie rental package consists of a complete outdoor theater, including delivery, set-up & removal, and liability insurance covering our equipment and services. A friendly Fun Flicks Technical Host will provide you with everything you see listed here:

☑ Agree      **3. PREMIERE TECH ARRIVAL:** Your FunFlicks Host will arrive approximately 1 hour before Movie Start Time indicated at the top of this contract (1.5 hours prior for Popcorn Events).  Your FunFlicks Host

**Video Gaming Events:** Customer is responsible for providing all video game consoles, games, controllers and any other equipment need to play. FunFlicks is providing the adapters need to connect your gaming console to our projection and sound system. The use of video gaming on our system any time during your

compensation, any photographs, videotapes, audiotapes, or other recordings of people and activities that are made during the course of this Event. In addition, FunFlicks may show logos, commercials, public service

successful screen rental for your function. All equipment is new and under warranty for your assurance - however there is always a risk of malfunctioning equipment. FunFlicks will not be held responsible for a

96.     On or about June 17, 2016, the Defendants caused to be prepared another contract with the same infringement on the FunFlicks Mark as Contract 1. A copy of the June 17th 2016 contract is attached hereto as Exhibit 22 and hereinafter referred to as "Customer Contract 2. The customer for Contract 2 accepted the Defendants prepared contract and emailed it to the FunFlicks email server rather than to the Defendants' e-mail address.

97.     The Defendants use of the Mark is continuing to confuse customers.

98.     Defendants have failed to advise their customers that their license has been terminated and is continuing to contract, and fulfill contracts using the FunFlicks Mark.

99.     Defendants own a truck/van where it displays the name FunFlicks on it in which they use to compete with the Plaintiff in the Movie Business.

100.     Mr. Lewis has represented to at least one other person inquiring about his services that his operation was the same company as FunFlicks but just had a recent "name change."

101.     The Lewis Defendants, individually and by and though its solely controlled LLC have failed to return the confidential and other materials defined in the agreement which include but are not limited to confidential marketing and pricing materials, contract templates, email templates, and receipt templates.

## IV - CAUSES OF ACTION

### COUNT ONE

**Breach of Contract, the Lewis Defendants**

102.    Plaintiff repeats and makes a part hereof each and every allegation set forth in the prior paragraphs into Count One of the Complaint.

103.    The Lewis Defendants defaulted and failed to cure the defaults under License Agreements.

104.    As a result of Defendants default and failure to cure, Plaintiff terminated the License Agreements.

105.    The Plaintiff advised the Lewis Defendants of the termination on June 3, 2016 via email and overnight night on the same date.

106.    In this letter, Plaintiff advised the Lewis Defendants, *inter alia*, of the following contained in the License Agreements: (a) The Covenant not to Compete; (b) to "immediately *discontinue all uses of the Mark and any term confusingly similar thereto*, *to destroy all materials bearing the Mark*; and (c) to return all materials identified in Section 7(a) of the license agreements. These materials included pre-designed samples bearing the FunFlicks Mark which include sample contracts and samples receipts bearing the Mark.

107.    Pursuant to Section 9 of the License Agreements, the above License Agreements' terms survive termination.

108.    Pursuant to Section 13 of the License Agreements, the respective The Lewis Defendants to the License Agreements are responsible for payment of the Plaintiff's Attorneys' fees incurred as a result of the Lewis Defendants breach of the License Agreements.

109.    There remains due and owing under the License Agreements a sum in excess of $100,000.00 for past due and undisclosed royalties, note obligations, and attorneys fees.

110.    In addition to the breaches  which resulted in the termination of License

Agreements, the Lewis Defendants are in breach of the post termination provisions of the License Agreements for reasons including but not limited to: (1) the Lewis Defendants' breach by their failure to pay amounts due under the License Agreements; (2) the Lewis Defendants' breach of the Covenant not to Compete; (3) the Lewis Defendants' breach by their continued use of the FunFlicks Mark; (4) The Lewis Defendants' breach by their continued use of materials which contains the FunFlicks Mark; (5) The Lewis Defendants' breach by their failure to destroy all materials bearing the FunFlicks Mark; (6) the Lewis Defendants' breach by their failure to return samples, including form samples of contracts, payments receipts, and marketing materials; The breaches identified in (2)-(6) in this paragraph are hereinafter referred to as the ("Competition and Trade Mark Breaches").

111.   As a former licensees with the FunFlicks brand, The Lewis Defendants have knowledge of specific confidential information and trade secrets of Plaintiff including but not limited to financial data, general business strategy, sales and marketing strategies, service cost and price structure, company innovations, and additional confidential information and trade secrets that would not have been available to Defendants save and except for their License Agreements with Plaintiff.

112.   The Restrictive Covenant is necessary to protect the goodwill and business and economic relations of Plaintiff.

113.   The Restrictive Covenant in reasonable in scope.

114.   Plaintiff has fulfilled its obligations under the License Agreements.

115.   Defendants' continued operation of a Movie Business is in direct violation of the Covenant not to Compete.

116.   As a proximate result of Defendants' actual and threatened Competition and

Trademark Breaches, Plaintiff is in imminent danger of suffering immediate and irreparable harm, with damages likely to be incurred in an unknown amount and are difficult to determine

117.    In the absence of injunctive relief, Plaintiff will suffer irreparable harm and injury resulting from their continued violation of the Covenant and Trademark Breaches.

118.    The License Agreements permit the Plaintiff to obtain both injunctive and monetary relief.

119.    In addition to the Competition and Trademark injuries sustained by the Plaintiff, the Lewis Defendants continue to owe Plaintiff– for (1) base royalties and past due note obligations in the approximate amount of $58,000.00; (2) amounts due for unreported gross sales royalties estimated to be in excess of $20,000.00 based on sales in comparable territories; and (3) attorneys' fees and expenses necessary for pursuing this cause of action.  Such amounts shall continue to increase as a result of The Lewis Defendants' ongoing material breaches of the License Agreements.

120.    The Lewis Defendants' breaches under the License Agreement are willful and malicious designed to inflict ill will on the Plaintiff.

## COUNT TWO

### INTENTIONAL INTERFERENCE OF CONTRACT
### AND/OR PROSPECTIVE BUSINESS ADVANTAGE
### Lewis Enterprises

121.    Plaintiff repeats and makes a part hereof each and every allegation contained in the prior paragraphs into Count Two of this Complaint.

122.    Lewis Enterprises, is owned, controlled and managed by the Lewis Defendant's

123.    Lewis Enterprises, by and through the Lewis Defendant's Actions has complete knowledge of the License Agreements and all matters related to or arising out of the Licensing

Agreements including but not limited to the requirements to provide open and honest sales reports to Plaintiff, provide proper access to verify reports, the notices of default and cure letters, Plaintiff's termination of the License agreements as a result of the Defendants' failure to cure the defaults and the Competition and Trade Mark Breaches..

124.    Lewis Enterprises has full knowledge that it is engaging in unlawful means by knowingly assisting the Lewis Defendants in the Competition and Trade Mark Breaches which survived the License Agreements' Termination.

125.    Consequently, Lewis Enterprises is interfering with the Plaintiff's License Agreements with the Defendants.

126.    Lewis Enterprises is also interfering with the Plaintiff's prospective business advantage, because Plaintiff's territories are less valuable and Plaintiff's prospective business advantage with Movie Business Customers.

127.    As a direct and proximate result of the foregoing conduct, Plaintiff is entitled to damages against Lewis Enterprises, in an amount that is presently unknown.

128.    As a proximate result of Lewis Enterprises' actual and threatened interference with the License Agreements and Plaintiff's prospective business advantage, Plaintiff is in imminent danger of suffering immediate and irreparable harm, with damages likely to be incurred in an unknown amount and are difficult to determine.

129.    In the absence of injunctive relief, Plaintiff will suffer irreparable harm and injury resulting from their continued violation of the Covenant and Trademark Breaches.

130.    Lewis Enterprises' conduct is willful and malicious and designed to inflict ill will on the Plaintiff

## COUNT THREE

### Demand for Accounting; Audit Demand

131.    Plaintiff repeats and makes a part hereof each and every allegation contained in the prior paragraphs into Count Three of this Complaint.

132.    Pursuant to the License Agreements at Section 3d, the Plaintiff is entitled to inspect a Defendants' sales records. As set forth above Plaintiff is entitled to inspect the Defendants sales records related to Lewis Defendants' Movie Business, Lewis Enterprises. These records include but are not limited the electronic records, original and backup of the Inflatable Office online system used by the Defendants and Defendants' online and software accounting programs.

133.    Plaintiff is unable to ascertain the full extent of Defendants' concealed sales, and profits without an accounting and audit of Defendants books and records, in their possession, custody and control. Further, this information is uniquely within Defendants' knowledge.

## COUNT FOUR

### Trademark Infringement, 15 U.S.C. § 1114

134.    Plaintiff repeats and makes a part hereof each and every allegation contained in the prior paragraphs into Count Four of this Complaint.

135.    This claim is for trademark infringement under the laws of the United States, section 32 of the Lanham Act, 15 U.S.C. § 1114(1) (a).

136.    As a result of the termination of the License Agreements, the Defendants are prohibited from using the FunFlicks Mark.

137.    Despite Plaintiff's warnings and demand to Defendants advising them to cease

and desist their use of the Mark upon termination of the License Agreements, the Defendants continue to use the FunFlicks Mark to compete with Plaintiff in the Movie business.

138.    The Defendants continue to use telephone numbers associated with the FunFlicks Mark in direct competition with Plaintiff and Plaintiff's use of the FunFlicks Mark.

139.    The Defendants continue to use FunFlicks Quotes, Contracts, Invoices, E-mail Templates and other documentation bearing the FunFlicks Mark and has sent out receipts bearing the FunFlicks Mark after the date of termination.

140.    The Defendants have failed to destroy all materials containing the FunFlicks mark and/ return any samples regarding the same including and form sample contracts, form sample receipts, marketing documents, etc.

141.    Defendants' unauthorized use of the registered FunFlicks Mark causes confusion or mistake among prospective or actual customers, in violation of section 32 of the Lanham Act. Further, such unauthorized use constitutes infringement of Plaintiff's trademarks rights to the FunFlicks Mark.

142.    Defendants have acted knowingly and willfully, with full knowledge of the likelihood of confusion, and with the intent to deceive consumers in order to trade off the promotional efforts and earned goodwill and reputation of the Plaintiff.

143.    The Defendants have acted in willful disregard of Plaintiff's rights in the FunFlicks Marks.

144.    As a direct and proximate result of the foregoing conduct, FunFlicks is entitled to damages against each Defendant, in an amount that is presently unknown.

145.    The Plaintiff is also is entitled by statute to an award of attorneys' fees and costs incurred in having to institute this legal action.

146.    Defendants' conduct is knowing, intentional, wanton, willful, malicious, and oppressive, and thus warrants this case being designated as exceptional under 15 U.S.C. §1117, and the imposition of treble damages against them.

## COUNT FIVE

### False Designation of Origin/False Advertising, 15 U.S.C. § 1125(a)

147.    Plaintiff repeats and makes a part hereof each and every allegation contained in the prior paragraphs into Count Five of this Complaint.

148.    Defendants' continued unauthorized use of the FunFlicks Mark in connection with the Movie Business is a false designation of origin and false advertising, and has caused confusion, mistake, and deception as to source, sponsorship, affiliation, or connection in the minds of the public.  This use of the FunFlicks Mark is a counterfeit mark within the meaning of section 34(d)(1)(B) of the Lanham Act, 15 U.S.C. §1116(d)(1)(B).

149.    Defendants' false designation of origin in interstate commerce has infringed on FunFlicks trademark rights in violation of section 43(a) of the Lanham Act, 15 U.S.C. §1125(a)(1).

150.    As a direct and proximate result of the foregoing conduct, Plaintiff is entitled to damages against each Defendant, in an amount that is presently unknown.

151.    Plaintiff also is entitled by statute to an award of attorneys' fees and costs incurred in having to institute this legal action.

152.    Defendants' conduct is knowing, intentional, wanton, willful, malicious, and oppressive, and thus warrants this case being designated as exceptional under 15 U.S.C. §1117, and the imposition of treble damages against them.

## COUNT SIX

### Trademark Dilution, 15 U.S.C. § 1125(c)

153.    Plaintiff repeats and makes a part hereof each and every allegation the prior paragraphs into Count Six of this Complaint

154.    This claim is for trademark dilution under the laws of the United States, section 43 of The Lanham Act, 15 U.S.C. §1125(c).

155.    Plaintiff is the exclusive licensor of the FunFlicks Mark.  Plaintiff has invested substantial time, effort, and millions of dollars in obtaining and promoting the services offered in interstate commerce under the FunFlicks Mark, such that the FunFlicks Mark is distinctive and famous.

156.    Despite knowledge of the legal interests of Plaintiff in and to the FunFlicks, Mark, Defendants have made use in interstate commerce of the Plaintiff's Marks, without Plaintiff's permission.

157.    Defendants' unauthorized use of the FunFlicks' Mark has diluted the distinctive quality of the Plaintiff's Mark.

158.    As a direct and proximate result of the Defendants' foregoing conduct, Plaintiff is entitled to damages and injunctive relief against each Defendant, in an amount that is presently unknown.

159.    Plaintiff is also entitled by statute to an award of attorneys' fees and costs incurred in having to institute this legal action.

160.    Defendants' conduct is knowing, intentional, wanton, willful, malicious, and oppressive, and thus warrants this case being designated as exceptional under 15 U.S.C. §1117, and the imposition of treble damages against them.

## VI.    CONDITIONS PRECEDENT

161.    All conditions precedent have been performed or have occurred, or have been prevented from occurring due to Defendants' actions.

## VII    RELIEF REQUESTED.

Plaintiff respectfully asks for the following relief, direct, or in the alternative, in its favor and against the Defendants, jointly and severally as follows:

a.    Judgment in favor of Plaintiff and against the Defendants on Counts One [against the Lewis Defendants], Count Two [against Lewis Enterprises] Counts Three Four Five and Six [against all Defendants].

b.    An award of attorneys' fees and costs and/or prejudgment interest in favor of the Plaintiff and against the Defendants as to Counts One [the Lewis Defendants], Count Two [against Lewis Enterprises] and Counts Four Five and Six [All Defendants] in an amount to be proven at and after trial in a post judgment hearing on the attorney's fees and costs

c.    An award of Compensatory and Punitive/Exemplary Damages awarded in favor of the Plaintiff and against the Defendants in an amount exceeding $100,000.00 in Compensatory Damages and an Amount Exceeding $100,000.00 to be determined at Trial as to Counts One [the Lewis Defendants], Two [against Lewis Enterprises] and Counts Four Five an Six [against all Defendants].

d.    A Temporary Restraining Order, and Preliminary, and Permanent Injunction directing that Defendants and all persons/entities in active concert or participation with any of them, be enjoined from the following as to Counts One, Two, and Four, Five and Six:

1)    Operating the business known as Premiere Outdoor Movies located in Marlton New Jersey or any other Movie Business for three years from June 3, 2016 within the United States.

2)    Using, in any manner whatsoever, any format, confidential materials programs, sample form contracts, sample form templates sample marketing materials templates, contracts associated with the FunFlicks Mark and

e.    A Temporary Restraining Order, Preliminary and Permanent Injunction as to Counts One, Two, and Four, Five and Six directing that the Defendants and their officers, agents,

servants, employees, and attorneys, and all persons in active concert or participation with any of them to

1) Notify all of Defendant's customers that the Defendants' are no longer associated with FunFlicks; and return all deposits and payments for work not yet completed to the customer.

2) Immediately cancel all telephone numbers contract with their carriers that are or were associated with Defendants while t/a FunFlicks or Premiere Outdoor Movies.

3) turn over to Plaintiff all copies of all materials in Defendants' possession including any operating and marketing materials, instructions, templates correspondence, brochures, agreements, disclosure statements and any and all other materials which contain or did contain the FunFlicks Mark;

4) Remove from Defendant's electronic devices and online cloud sites of which it has control, the same identified items in subparagraph 3) above.

f.    Order the Defendants to contact and give such permissions as necessary to the providers of Inflatable Online Software allowing this company to provide Plaintiff full and complete electronic copies of Defendants' sales records including all current and back up data for the years 2013 to present within five days from the date of the Order.

g.    As to Count Three [Accounting and Audit] - that an accounting and audit be directed to determine (1) the profits resulting from its infringement and unfair competition, and (2) that the profits be paid over to the Plaintiff, as the Court determines is appropriate to the circumstances of this case, and (3) Defendants gross sales in the Movie Business from January 1, 2013 through June 1, 2016.

h.    Such other and further relief to which Plaintiff is justly entitled.

/s/Troy C. Swanson
Troy C. Swanson
Fed. Bar# 05806
Cipriani & Werner, P.C.
11350 McCormick Road Tower III
Suite 302
Hunt Valley, MD 21031
410.410.0700
410.420.0222
tcswanson@c-wlaw.com
Attorneys for Plaintiff FunFlicks, Inc.